**SO ORDERED.**

**SIGNED this 26 day of July, 2007.**



_____
**ROBERT E. NUGENT**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

NOT DESIGNATED FOR PUBLICATION

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| EL CHARRO, INC., | ) | Case No. 05-60294 |
| | ) | Chapter 11 |
| Debtor. | ) | |

**MEMORANDUM OPINION**

The Court convened a confirmation hearing in this Chapter 11 case on April 25, 2007. At the hearing, the debtor and Commerce Bank, the debtor's principal creditor, announced that confirmation would largely turn on the Court's determination concerning the value of the Bank's remaining collateral, the El Charro Restaurant in Dodge City. Confining the scope of the hearing to the valuation issue, the Court heard the testimony of Richard and Patricia Rodriguez, the owners of the debtor, John Ploger, the debtor's appraiser, and William Miller, the Bank's appraiser. Based upon that testimony and a review of the appraisal reports submitted by Ploger and Miller, the Court

-1-

makes the following findings of fact and conclusions of law.

Procedural Setting

The Court has jurisdiction of this core proceeding to determine the value of this asset under 11 U.S.C. § 506(a) and Fed. R. Bankr. P. 3012.[1] The Debtor filed an amended plan on April 20, shortly before the hearing in this matter.[2] That plan has not been balloted, but the Bank has filed an objection.[3] Debtor's previous plan was balloted and the Bank rejected it. The unsecured creditors accepted it. Accordingly, if the amended plan does not alter the treatment of the unsecured creditors, it need not be re-balloted and resolution of the present valuation issue will allow the Bank's secured claim, but whether the amended plan is feasible or whether other aspects of the proposed treatment of that claim are fair and equitable as required by 11 U.S.C. § 1129(b) will remain to be determined.

Background

Debtor operates a restaurant in Dodge City. The El Charro has been in business for about 23 years. After experiencing early success in Dodge City, the debtor also commenced operations in Garden City. Pursuant to this Court's order, the Garden City property has been sold and the proceeds applied to both the Small Business Administration's debt and that of Commerce Bank. The Bank retains a principal claim of about $330,000 plus accrued interest at the time of the hearing of about $50,000.

The Rodriquez's testified that while the Dodge City property enjoys good sales, there are significant items of deferred maintenance to be addressed. These include kitchen repairs, termite

---

[1] 28 U.S.C. § 157(b)(1) and (b)(2)(K) and (O); 28 U.S.C. § 1334(b)(1).

[2] Dkt. 167.

[3] Dkt. 177.

-2-

damage, repairs to the flat roof, and plumbing renovations.  They report that the freezers are antiquated, that there is serious damage to the walls of the kitchen due to termites, and that the bathrooms need to be upgraded to be ADA-compliant.  There was no evidence concerning what all this might cost, but both appraisers adjusted their analysis in some way to consider these flaws in the property.

### The Property

The El Charro Restaurant is located along West Wyatt Earp Boulevard in Dodge City, Kansas.  It consists of a single building on a city lot and a parking area on an adjoining lot.  The building has a drive-up window for picking up "to go" orders.  According to the appraisal reports, the property is a frame and stucco building equipped as a full service restaurant.  The 4,393 square foot building was erected in 1976, enlarged in 1986 and further modified by the installation of the drive up window in 1989.  The area of the real estate involved is 42,214 square feet fronting on Wyatt Earp Boulevard, which is also U.S. Highway 50, a main thoroughfare through Dodge City that traverses the state of Kansas from East to West and is a principal artery in Central and Western Kansas.  The debtor operates a Mexican food restaurant on the premises.  The appraisal photographs show that the exterior and the interior public areas are attractive, but that the kitchen and cooler areas suffer from much damage and deferred maintenance.

### The Appraisals

Debtor's appraisal witness, John Ploger, is a licensed and certified appraiser in Kansas.  The Bank stipulated to his qualifications to testify as an expert in this matter.  William Miller is also a licensed and certified appraiser and the debtor stipulated to his expertise.  As the Court commented at trial, both of these witnesses were credible and their respective analyses seemed valid.  But

commercial appraisal is, to some degree, a speculative pursuit. In order to understand the differences between the appraisers' ultimate conclusions, the Court looked at the variations in how they approached their respective assignments. Both appraisers gave an opinion of value of the property by using the three common appraisal approaches: cost, income, and sales. Ploger valued the property at $316,000 while Miller valued it at $400,000.

Cost

Both appraisers started with the cost approach, although each testified that, as a property ages and uses up its useful life, cost becomes less accurate because of the inherent difficulty of determining the appropriate level of depreciation adjustments to be taken from the present day cost of construction. The oldest elements of the subject property exceed 30 years of age. Miller's cost value approximates $433,000 while Ploger's is approximately $348,000. While their estimates of initial cost are similar (Miller's $685,885 v. Ploger's $679,043) and their estimates of land cost are nearly identical ($169,220 vs. $169,000), most of the $85,000 difference in their cost approaches comes from differing views as to deterioration and obsolescence. Ploger allocates an incurable physical deterioration at 61 per cent of the cost of the improvements, or about $380,900. Miller calculates the "non-curable" physical deterioration at only 50 per cent, or $329,943. The witnesses' assessments of curable deterioration are fairly similar: Ploger estimates $33,290 while Miller estimates $26,000. The balance of the difference could be found in Miller's assessment of $65,989 in economic obsolescence (Ploger says this should be $76,243) or in Ploger's depreciation of site improvements of 53 per cent (Miller does not have a separate line item for this deduction). Because of the wide latitude of judgment that the appraisers must employ in determining depreciation factors to be applied to determine the "cost" of a 31 year old building, the Court discounts this approach as

having little utility other than as a "test" of the valuation under the other two approaches.

Income

In comparing the witnesses' results concerning the income approach, meaningful differences become more apparent. Ploger determined that the income-based value of the property was $287,830 compared to Miller's estimate of $430,000, a difference of some $143,000. Close study of the reports and testimony satisfies the Court that neither of these numbers is entirely supportable. Ploger's analysis did not use actual income and expense reports to determine what the gross income might be. Instead, because Ploger felt that real-time economic performance of the business might be skewed by the administrative costs of chapter 11, he imputed income to the debtor based upon the cost of rent. By determining what a reasonable rental for the property might be (based on comparative leases of restaurants in Kansas), Ploger determined that El Charro would rent for $10.61/square foot to generate annual rents of $50,520. Ploger tested this conclusion with an estimate, based upon his interviews with the Rodriguez's, that the restaurant generates $750,000 in gross revenues in a typical year. Because the restaurant industry advocates that rent should never exceed six per cent of sales in a successful restaurant venture, Ploger determined that a "successful lease" would yield no more than $45,000, close to the $50,520 figure developed by surveying actual restaurant leases. With a deduction of a five percent vacancy factor from the $50,520 figure, the net rent might be $47,994. Deducting taxes and imputed costs of insurance and management, the net operating income for this property as a rental property would be $30,510. Dividing that by a capitalization rate of .106 (a rate that Miller agreed with), the income-based value of the property would be $287,830. The Court notes that this methodology is predicated on several layers of assumptions and is possibly less reliable than an income analysis based on actual financial

performance.

Miller examined the debtor's actual performance at the Dodge City location in 2005 and 2006. Interestingly enough, in 2005, actual revenues exceeded $703,000 while in 2006, annualized revenues exceeded $750,000, numbers very similar to those assumed by Ploger. A review of the statements upon which Miller relied reveals some flaws in his analysis, however. Miller uses the same cap rate as Ploger, but concludes that in an average year, the net operating income of El Charro in Dodge City would be about $45,561 which, when divided by the .106 cap rate, yields a value of $430,000, some $143,000 more than Ploger. In using the actual figures, Miller attempted to adjust them for interest and the unusual expenses of a chapter 11 case. He did not adjust, however, for an unusual income entry in 2005 of $33,000 for the "Wyatt Earp Project." No such item is shown in 2006. If this entry is deducted from 2005 net operating income, $41,197 remains. Miller did adjust the unusually large attorney's fees expense figure for 2006 of $34,628 down to $12,000 to approximate a "normal" chapter 11 year of fees, leaving net operating income of $16,925. The average of 2005 and 2006 would then be $29,061, not $45,561, and, applying the cap rate of .106 would yield a value of $274,160, lower than Miller's or Ploger's estimates.

Sales

Both appraisers testified that the comparable sales approach was the most reliable method of valuing this particular property. Both appraisers looked at similar properties, both in and outside of Dodge City. Many of their "comps" were the same properties. Ploger examined six comparable sales, and considered two to be most applicable – the King's Buffet property and the Montana Mike's property, both in Dodge City and both located along West Wyatt Earp Boulevard. Both lack a drive up window and he applied a factor of five per cent of the value of each property for that.

-6-

Ploger adjusted the King's Buffet property valuation to reflect that it is a brick structure, not stucco like El Charro. He also applied a significant adjustment for condition, finding King's to be in "superior" condition. As to Montana Mike's, Ploger applied a location adjustment of five per cent because Montana Mike's is adjacent to Boot Hill, a tourist attraction. King's sold for $75.68 per square foot in January of 2001 and, after adjustments, its comparable value is $71.43 per square foot. Montana Mike's sold in October of 2004 for $78.77 a square foot and, after adjustments, its comparable value was set at $74.73 per square foot. Montana Mike's was a former Golden Corral that, after purchase, required the further investment of $400,000. Miller and Ploger agreed that this property, in its pre-renovation condition, was a good indicator of value for the El Charro property. Based on his comparative analysis, Ploger assessed value to El Charro of $72 per square foot, or $316,296.

    Miller examined several properties, two of which were the King's building and Montana Mike's. He referred to the latter property as a "dead ringer" for El Charro as a comp. He made significant adjustments to both of these properties, including assessing a ten per cent deduction for their lack of a drive-up window. This adjustment alone accounts for an increase in the Montana Mike's property value of $7.87 to $86.65, some $12 more than Ploger posits. The Rodriquez's testified that the window accounts for a substantial portion of their sales, and the financial reports demonstrate that window sales represented as much as fifteen percent of El Charro's gross sales in 2006. It is clear that the drive-up window is valuable, but not so clear that it should represent ten percent of the value of the building. After all, on Miller's numbers, this window would be "worth" $37,800, based on his sales-approach estimate of the building's value at $378,000. Miller also makes no adjustment to Montana Mike's for condition, while Ploger rates it "superior" and applies

-7-

a 20 per cent adjustment. Notably, Miller's adjustments to the King's property result in a $75.68 per square foot value as compared to Ploger's $71.43 per square foot value.

Appraisers' Conclusions

To summarize, Ploger's and Miller's values under the various approaches are shown in the table below, along with their ultimate conclusions as to value:

| **Method** | **Ploger** | **Miller** |
| --- | --- | --- |
| Cost | $348,000.00 | $433,000.00 |
| Income Cap | $288,000.00 | $430,000.00 |
| Comparable Sales | $316,000.00 | $378,000.00 |
| **Ultimate Value** | **$316,000.00** | **$400,000.00** |

Analysis

As a plan proponent, the debtor has the burden to demonstrate by a preponderance of the evidence its valuation of the Bank's collateral.[4] Section 506(a) provides that the Bank's allowed secured claim is secured only to the extent of that value. What that value is will drive what the debtor is required to pay the Bank in order to retain the restaurant under § 1129(b)(2)(A). Section 506(a) states: "Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." Debtor proposes to retain and use the property in the implementation of its plan. Section 1129(b)(2)(A)(i)(II) requires that debtor pay

---

[4] *In re Valley View Shopping Center,* L.P., 260 B.R. 10, 22 (Bankr. D. Kan. 2001) (Proponent of proposed chapter 11 plan bears the burden of proof with respect to each element of the sections of the Bankruptcy Code governing plan confirmation and cramdown, under a preponderance of the evidence standard.); *In re American HomePatient, Inc.*, 420 F.3d 559, 570 (6th Cir. 2005) (The appropriate valuation of creditors' secured interest in chapter 11 debtor's assets is a question of fact)

-8-

to the Bank a value that, as of the effective date of the plan, equals at least the value of the Bank's collateral.[5]

Both witnesses were qualified, credible and competent, making the Court's decision a little more difficult. On balance, however, the Court concludes that the preponderance of the evidence weighs heavily in favor of the debtor's proposed valuation for the following reasons. While both appraisers weighed the comparable sales approach most heavily in their process, the Court can look to their income capitalization estimates as means of testing or validating their sales value conclusions. Miller apparently used his income valuation of $430,000 to support an ultimate valuation of $400,000 when his sales approach estimate was only $378,000. As noted above, the Court found a flaw in Miller's income analysis, its failure to consider the extraordinary income item in 2005. Adjusting for that item dramatically lowers the capitalized income value to $274,160, substantially less than the $430,000 income value Miller gave. This impeaches to some extent his ultimate value conclusion.

The Court was also dubious about the ten per cent adjustment made to the comparable sales properties for the drive up window. This adjustment, which in real terms results in an increase of value of some $37,800, seems suspect given the overall value and condition of the El Charro property. While there is no evidence on this point, it seems unlikely that creating such a window would cost that much.

Finally, both witnesses noted various deferred maintenance or obsolescence issues that they variously valued – Miller's $26,000 to Ploger's $33,000. This suggests that El Charro is not a premium property and needs substantial work to reach its full potential value and persuades the

---

[5] *In re Valley View Shoping Center, L.P., supra* at 34-35.

Court that the lower value is more supportable.

In sum, the Court finds that the Bank's secured claim in this case shall be allowed in the amount of $316,000, the value assessed by Ploger. With this determination, the Court believes the debtor's amended plan dated April 20, 2007 is ready for a hearing on confirmation. The Court will therefore convene an evidentiary hearing on **August 29, 2007** at **1:30 p.m**. to take up confirmation of debtor's amended plan dated April 20, 2007 and the Bank's and any other objections thereto.

IT IS SO ORDERED.

# # #